IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ZACHEAUS OLANIYAN, As Special )
Administrator of the Estate )
of BOLUTIFE OLANIYAN, Deceased, )
)
Plaintiff, )
)
vs. )   No. 04 C 5827
)
CSX TRANSPORTATION and )
Anthony Stall, )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

On Sunday September 14, 2003 Bolutife Olaniyan was struck and killed by a freight train owned by defendant CSX Transportation ("CSX") at approximately 8:55 a.m.  At the time of his death, Bolutife Olaniyan was five years old and lived with his mother and sister in a basement apartment at 4517 Baring Avenue in East Chicago, Indiana.  The apartment was located approximately one half block from the train tracks where he was killed.

On the morning of September 14, unbeknownst to his mother and sister, Bolutife Olaniyan, who had been eating his breakfast alone in the kitchen, unlocked the apartment door, left the apartment, and wandered down the street.  A witness, Leonard Grigsby ("Grigsby"), observed Bolutife Olaniyan prior to his death. Grigsby first noticed Bolutife Olaniyan walking toward the tracks from the South and observed that he appeared to be crying. Bolutife Olaniyan was wearing a long blue shirt and did not appear

to be wearing any pants. Afraid that people would think that he had taken the boy's pants if he approached him, Grigsby decided to call the police to alert them that a young boy was playing near the tracks. In search of a phone, Grigsby came upon witness Jesse Hawkins ("Hawkins") in front of a building and asked that he call the police. Grigsby stated that Bolutife Olaniyan was on the tracks approximately 1-2 minutes before being struck by the train.

While attempting to contact the police, Grigsby heard a train approaching. The train Grigsby heard was a CSX locomotive traveling westward. Defendant Anthony Stall ("Stall") was the engineer of the train and John Kostoff ("Kostoff") was the conductor. The train's horn started blowing approximately one mile east of the Baring stop as the train approached a series of crossings and continued to sound until the train struck Bolutife Olaniyan. According to the record, there was nothing obstructing Stall and Kostoff's view from the train for more than one mile as it approached the Baring Avenue crossing. According to Kostoff, he was keeping a lookout from his position on the cab of the lead locomotive and could see "as far as you can see on a clear day."

The record is unclear as to exactly where Kostoff and Stall first saw Bolutife Olaniyan. According to the CSX accident report (created in March, 2004) the two saw the boy after moving over the Indianapolis Ave. crossing, which is approximately 720 feet east of the Baring Avenue crossing. According to the depositions of Stall

2

and Kostoff (taken in August, 2005), the two first saw the boy at Magoun Avenue, which is approximately 360 feet east of the Baring Avenue crossing. When Stall saw Bolutife Olaniyan, he was bending over and Stall believed him to be standing in between the two sets of parallel tracks at the Baring Avenue crossing. Stall asked Kostoff if he thought the boy was in the clear and Kostoff replied "I think so." Stall did not apply the brakes. The train proceeded at the same speed and fatally struck Bolutife Olaniyan. The record shows that prior to impact Bolutife Olaniyan stood up, but otherwise did not move from the time Stall saw him.

After the train struck Bolutife Olaniyan, Stall made a service (non-emergency) application of the brakes and stopped the train in approximately 3,200 feet. According to Kostoff and Stall, the impact occurred approximately ten feet west of the Baring crossing.

Subsequent to the accident, Bolutife Olaniyan's father, Zacheaus Olaniyan, brought a two count complaint as special administrator to the estate of Bolutife Olaniyan. The first count alleges that defendants breached their duty of ordinary care to Olaniyan by 1) operating the train at an excessive speed for the then prevailing conditions; 2) operating the train without sufficient brakes; 3) failing to sound a warning at sufficient distance from the crossing to allow pedestrians to clear the crossing; 4) failing to stop the train in time to avoid the collision; 5) failing to keep a proper and sufficient lookout; 6)

3

failing to adequately operate or maintain the pedestrian restriction gate at the Baring Avenue crossing; 7) failing to equip the train with efficient power brakes including an efficient emergency system; 8) failing to apply the brakes when danger was imminent; and 9) failing to provide and place and then adequately operate or maintain a pedestrian restriction gate at the Baring Avenue crossing. The second count alleges that CSX failed to comply with the Federal Safety Appliance Act 45 U.S.C. § 1 by failing to equip the train with efficient and operating power brakes.

Defendants move for summary judgment. At this time I also review defendants' motion to strike the report of plaintiff's expert Richard Biell and Olaniyan's motion to file a second amended complaint.

### I. Motion to Strike the Report of Richard Beall

Defendants move to strike the report of plaintiff's expert Richard Beall ("Beall") from consideration. FED. R. EVID. 702 states in part that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise . . . .

"[A] court should consider a proposed expert's full range of practical experience as well as academic or technical training when

4

determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). It is evident that Beall is qualified as an expert. Beall has worked in the railroad industry since 1969 as, *inter alia*, an engineer, a conductor, and a safety and operations consultant. Additionally, Beall has taught and presented at numerous seminars regarding railway safety and has been published in numerous publications regarding railway safety and accidents.

Defendants argue that Beall's report should be stricken because it is based upon unsupported speculation. Defendants seek to strike the following assertions made by Beall: 1) that the event recorder indicates improper horn sequencing; 2) that the horn activation was insufficient to warn vehicular traffic, the general public and the decedent of the approaching train; 3) that if the crew had been keeping a proper lookout, they could not have missed the decedent; 4) the train crew should have applied the brakes in emergency when they saw the boy; 5) the if the engineer had blown long distinct whistle blasts at the crossings followed by frantic successions instead of the horn sequences evidenced on the event recorder, the decedent would have had a better chance of hearing the oncoming train; and 6) that the crew's violation of the CSX operating rules, alleged lack of reasonable care, and possible insufficient training and experience was a contributing cause to the accident.

To the extent Beall's report is relevant and derives from his extensive experience it is useful and admissible under Rule 702. Therefore, Beall's analysis of the event recorder is both appropriate and relevant. Furthermore, his experience in the railway history qualifies him to him to speak about effectiveness and appropriateness of various safety procedures. To the extent Beall's testimony exceeds the scope of his particular knowledge, it is inappropriate, however, and will not be considered in this motion.

## II. Summary Judgment

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Lexington Ins. Co. v. Rugg & Knopp*, 165 F.3d 1087, 1090 (7th Cir. 1999); FED. R. CIV. P. 56(c). I must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Anderson. v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## A. Choice of Law

A federal court exercising diversity jurisdiction applies the

choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). In a tort case, Illinois courts use the most significant contacts approach. *Wreglesworth v. Arctco, Inc.*, 316 Ill. App. 3d 1023, 1031, (Ill. App. Ct. 2000). This requires the court to apply the local law of the place of the injury unless it is shown that another state has a more significant relationship with the occurrence and with the parties. *Id.*

In this case, the injury took place in Indiana and no evidence suggests any other state has a more significant relationship with the injury or the parties. Therefore, Indiana law applies.

## B. Negligence Claims

The first count of the complaint asserts that defendants were negligent for a number of reasons. "Actionable negligence has three essential elements: (1) a duty imposed by law to do or not to do a certain act; (2) a violation of that duty by an act or omission to act which constitutes a breach of that duty; and (3) injury proximately caused by such breach of duty." *Terre Haute, etc. Traction Co. v. Phillips*, 191 Ind. 374 (1921).

Defendants argue that Olaniyan's claim based upon the train operating at an excessive speed is preempted by The Federal Road Safety Act ("FRSA"). The FRSA provides a comprehensive system of regulation of railroads. The Secretary of Transportation is empowered to issue regulations in order to supplement the FRSA. 49

U.S.C. § 20103. As part of that system of regulation, the Secretary has issued regulations setting forth the maximum allowable speed for trains. *See* 49 C.F.R. § 213.9. Thereafter, state law negligence claims based upon excessive speed have been held to be preempted by these regulations. *See CSX Transp. v. Easterwood*, 507 U.S. 658, 676 (U.S. 1993) ("under the FRSA, federal regulations adopted by the Secretary of Transportation pre-empt respondent's negligence action . . . insofar as it asserts that petitioner's train was traveling at an excessive speed."); *Waymire v. Norfolk & Western Ry.*, 218 F.3d 773, 776 (7th Cir. 2000).

According to 49 C.F.R. § 213.9, the maximum allowable operating speed for a freight train on a Class 3 track is forty miles per hour. According to the undisputed evidence, the train in this case was traveling on a Class 3 track and never exceeded forty miles per hour in the five miles prior to the point of impact where Bolutife Olaniyan was struck and killed. Summary judgment on that part of Count I which alleges negligence based on excessive speed is therefore granted.

Defendants argue that Olaniyan's other theories of negligence also fail. Generally, according to Indiana premises liability law, the duty owed a trespasser -- including that of a person who enters on a railroad's right of way -- is to "to refrain from willfully or wantonly injuring [the trespasser] after discovering his presence." *Perry v. Western Railway Co.*, 865 F. Supp. 1292, 1297 (N.D. Ind.

8

1994) (quoting *Cleveland C., C. & St. L. Ry. Co. v. Means,* 59 Ind.

App. 383, 391 (Ind. App. 1914)). Indiana law does, however, impose

a duty of reasonable care on a railroad to avoid injuring a child

*non sui juris* when the railroad has actual or constructive

knowledge of the child's presence. *See Id.* at 402; *Holstine v.*

*Director General of Railroads,* 77 Ind. App. 582, 599-600 (Ind. Ct.

App. 1922). In *Holstine,* the court stated:

> [D]uty in such cases may arise from the fact of the
> presence of a child of immature years in a situation of
> peril coupled with knowledge, actual or constructive, of
> the owner of the premises on which the child is situated
> of the perilous situation of such child.

*Holstine,* 77 Ind. App. at 599-60.

Defendant does not contest that Bolutife Olaniyan was a child

*non sui juris* as a matter of law due to the fact he was five years

old. *See Indiana Harbor Belt Ry. Co. v. Jones,* 220 Ind. 139, 145

(Ind. 1942). Thus, if defendants had either actual or constructive

knowledge of his presence and peril on the tracks, they owed a duty

of ordinary care to him. Constructive knowledge may be imputed

when "'[k]nowledge that children often frequent the vicinity over

which a train travels places an affirmative duty of the railroad to

exercise vigilance as to the *non sui juris* child.'" *Perry,* 865 F.

Supp. at 1297 (quoting *Clayton v. Penn Cent. Transp. Co.,* 176 Ind.

App. 544, 376 N.E.2d 524, 526 (Ind. App. 1978)). Defendants argue

that there is no basis for imputing constructive knowledge on

defendants of Bolutife Olaniyan's presence on the track. I agree

9

that the Olaniyan has put forth no evidence that could support a conclusion that defendants had constructive knowledge of Bolutife Olaniyan's presence on the tracks.

Defendants also had a duty to exercise reasonable care if they had actual knowledge of Bolutife Olaniyan's presence on the track and that he was in danger. It is undisputed in this case that both Stall and Kostoff saw Olaniyan prior to the time the train struck him. At the point that they saw Bolutife Olaniyan in danger, they owed him a duty of care and the question then becomes whether the actions they took fulfilled that duty and whether any potential breach of duty caused Bolutife Olaniyan's death.[1]

I find that the following issues of material fact exist in the record as to whether defendants met their duty of reasonable care. First, there is a dispute as to whether the train's horn was sounded in a manner that complied with CSX's operating rules and in a manner that provided adequate warning to Bolutife Olaniyan.[2] Evidence of a failure to comply with company rules is admissible

_____

[1] There is a dispute as to where Stall and Kostoff first saw Bolutife Olaniyan and had knowledge of his peril. Statements made by the defendants indicate that Stall and Kostoff saw Bolutife Olaniyan at some point approximately between 360 and 720 feet from the Baring Avenue Crossing. At this point, Stall and Kostoff had knowledge that Bolutife Olaniyan, a child *non sui juris,* was in a position of danger, even if they have stated their belief that he might have been clear of the tracks.

[2] Olaniyan does not argue and nothing in the record suggests that defendants failed to comply with the Indiana statute governing the sounding of the horn. Burns Ind. Code Ann. § 8-6-4-1.

10

and relevant to the determination of whether defendants met their duty of care. *See New York C. R. Co. v. Wyatt*, 135 Ind. App. 205, 233 (Ind. App. 1962). In his deposition, Stall stated (and the report of Beall corroborates) that the CSX operating rules require that "when [the] train approaches the whistle post, the locomotive will sound in the case of two longs, one short, and one long blast of the horn" and that "[w]hen there's a person on or about the tracks, the horn will be sounded in a manner of a series of short blasts." In his first declaration, defendants' expert, Dennis Biegel, states "the event recorder download shows the horn commenced sounding approximately one (1) mile east of Baring Ave and was sounded repeatedly until the train crossed Baring Avenue." In his second declaration, Biegel states "during the period of fourteen (14) seconds (approximately 750-800 feet) prior to the time the train crossed Baring Avenue the horn was sounded at least six (6) distinct times of varying durations and the bell was ringing continuously." On the other hand, Olaniyan's expert, Beall, states in his report that analysis of the event recorder shows that "Stall violated these rules by only giving what was tantamount to a 'toot-toot, toot-toot' sequencing for these crossings . . . [and that] a repeated succession of short whistle blasts . . . was not evidenced on the event recorder." Both parties have submitted analysis of the same event recorder and come to different conclusions as to whether Stall sounded adequate warnings.

11

Additionally, although Biegel testified that the horn sounded six times and at varying lengths, his testimony does not indicate that the sequence actually complied with the operating rules.

There are also disputed issues of fact relating to defendants' application of the train brakes. It is undisputed that defendants did not apply the train's brakes (either emergency or standard) when they saw Bolutife Olaniyan on the track and that the brakes were not applied until after the train struck Bolutife Olaniyan. Failure to apply the brakes upon seeing Bolutife Olaniyan in danger on the tracks is evidence from which a fact-finder could conclude that defendants breached their duty to Bolutife Olaniyan as a child *non sui juris*. *See Holstine,* 77 Ind. App. at 598. ("In the case of children or infants, however, they . . . must at once arrest the speed of the train as soon as they discover the children, . . . on the track or in a place of danger.").

Defendants argue that any claim based upon failure to apply the brakes must fail because Stall stated in a declaration that "I am certain that had I applied the brakes in emergency as soon I observed the boy, I could not have stopped the train before I reached him." As plaintiffs point out, this conclusory statement is irreconcilable with Stall's earlier deposition testimony in which he stated multiple times that he could not approximate the distance the train could stop if he made an emergency application

of the brakes.[3]  Stall has provided no explanation for the change

in his testimony between his August, 2005 deposition and his

subsequently filed declaration of October, 2005.[4]  Indeed, so far

---

[3] Stall's deposition transcript reads:

Q. Given the train you were operating at the time of
the occurrence, what would have been the stopping
distance that the train could stop with an application
of the emergency brakes?
A. I can't give you an exact distance.
Q. Could you give me an approximation?
A. You want the approximation of the stopping distance
at 40 miles an hour with the service application is
that what you are asking?
Q. Emergency application.
A. In an emergency application?
Q. Right.
. . .
The Witness: I do not know the exact distance.
Q. The approximate distance, I didn't say the exact
distance.
A. No I can't given an approximation.
. . .
Q. Give me an approximation, how much less than 3,447
feet?
A. When a train is -- when the train brakes are applied
in emergency, it's not a standard braking procedure.
Q. All the air is vented out for the line at one time?
A. That's correct.
Q. And then all the brakes in all the cars are applied
simultaneously, right?
A. Yes, I cannot give you an estimated distance of how
short the train would stop in an emergency application
of the brake.

[4] It is well settled in this Circuit that "an affidavit
cannot be used to create a genuine issue of material fact where
the affidavit differs from prior deposition testimony to the
point that it is unreliable." *Patterson v. Chicago Ass'n for
Retarded Citizens*, 150 F.3d 719, 720 (7th Cir. 1998).  Here,
defendants cannot use Kostoff's affidavit which directly
contradicts his earlier testimony to the point it is unreliable
to show that there is not a genuine issue of material fact.

13

as I have found, there is no expert opinion (surely required) on the distance that would have been required to stop the train if the emergency brakes had been applied, the time difference that would have occurred before the train hit the decedent if the emergency brakes had been applied,[5] or whether the lower speed of the train when it him (if it would have hit him) would have allowed him to survive, if that is knowable. For these reasons, I find that the current record does not support the conclusion that defendants' conduct did not cause Bolutife Olaniyan's injuries as a matter of law. Accordingly, I deny defendants' motion for summary judgment for claims based upon failure to apply the brakes.

Defendants next argue that Olaniyan has not put forth any evidence to support his claims of negligence based upon operating the train without sufficient brakes or contested their claim that they had no duty to operate or maintain a pedestrian restriction gate at the site of the accident. I agree. Summary judgment on these claims is granted.

I reserve ruling on whether Olaniyan's claim of negligence based upon defendant's duty to keep a proper lookout is barred. Olaniyan alleges without citing any relevant Indiana authority that defendants violated their general duty to keep a lookout in this

---

[5] According to Olaniyan, if defendants first saw the decedent when they were 360 feet away, the train hit Bolutife Olaniyan a mere 6.46 seconds later, if the train was traveling 38 mph, as the engineer testified.

case by not spotting Bolutife Olaniyan on the tracks earlier. Defendants have responded that no such duty to keep a lookout for trespassers exists. Neither party adequately has addressed the issue of whether given the location of the tracks passing through East Chicago, and the location of impact, in the middle of a series of public crossings just west of the paved portion of the Baring Avenue crossing, a duty was owed to Bolutife Olaniyan to keep a proper lookout.

### III. Motion to File A Seconded Amended Complaint

Olaniyan now moves to file a second amended complaint in this action. The second amended complaint seeks to make the following changes: 1) add a sub paragraph alleging defendants "failed to reduce the speed of the train when danger was imminent;" 2) remove certain allegations of negligence from Count I and 3) replace the substance of Count II with a charge alleging in essence the same conduct in Count I, but stating that defendants' conduct was willful and wanton.

FED. R. CIV. P. 15(a) instructs that leave to file an amendment shall be freely given when justice so requires. In order to be willful and wanton, conduct must be "1) an intentional act done with reckless disregard of the natural and probable consequence of injury to a known person under the circumstances known to the actor at the time; or 2) an omission or failure to act when the actor has actual knowledge of the natural and probable consequence of injury

15

and his opportunity to avoid the risk." *Witham v. Norfolk and W. Ry. Co.*, 561 N.E.2d 484, 486 (Ind. 1990). In *Witham*, the court held that willful and wanton conduct requires two elements: that the defendant had "knowledge of an impending danger or consciousness of a course of misconduct calculated to result in probable injury; and . . . must have exhibited an indifference to the consequences of his conduct." *Id.* A fact-finder could conclude that defendants knew of an "impending danger" when they saw a small child on or next to the railroad tracks. It is unclear at this point whether the failure to apply brakes immediately "exhibited an indifference to the consequences of this conduct." The amended second count does not create the need for additional discovery. In regard to the other changes Olaniyan seeks to make in his second amended complaint, defendants have stated that they do not object and I find the proposed changes to be consistent with my rulings on the motion for summary judgment.

Therefore, I grant the motion to file the second amended complaint. The court notes, however, that Count II of the complaint is amended to allow only those claims based upon failure to sound an adequate warning, failure to apply the train's brakes, and failure to keep a proper lookout because those are the only claims that have survived defendants' motion for summary judgment.

ENTER ORDER:

_Elaine E. Bucklo_

_____
**Elaine E. Bucklo**
United States District Judge

DATED: March 9, 2006

16